UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SEAN MICHAEL RYAN,

　　　　　*Plaintiff*,

*v.*

NOAH NAGY,
HEIDI WASHINGTON, and
GRETCHEN WITMER,[1]

　　　　　*Defendants*.

_____/

CASE NO. 2:20-cv-11528

DISTRICT JUDGE LAURIE J. MICHELSON
MAGISTRATE JUDGE PATRICIA T. MORRIS

## REPORT AND RECOMMENDATION ON DEFENDANTS MOTION TO DISMISS AND FOR SUMMARY JUDGMENT (ECF No. 24)

I.　　**Recommendation**

　　For the reasons below, **I RECOMMEND** that Defendants' Motion to Dismiss and for Summary Judgment (ECF No. 24) be **GRANTED**.

II.　　**Report**

　　A.　　**Background**

　　Plaintiff is a prisoner of the Michigan Department of Corrections ("MDOC") at the G. Robert Cotton Correctional Facility ("JCF") who alleges that Defendants instituted a housing policy that increased his risk of contracting COVID-19 and other contagious diseases. (ECF No. 6, PageID.91–92.) Specifically, Plaintiff alleges that prisoners at the

---

[1] I note that, although misspelled in the docket, Gretchen Witmer's name is correctly spelled as "Gretchen Whitmer."

1

facility are required to share bunk beds that are less than six feet apart.  (*Id.* at PageID.92.)
While the federal government has recommended throughout the COVID-19 pandemic that
individuals be "socially distanced" from each other by at least six feet to lower their risk
of contracting COVID-19, JCF's housing policy makes it impossible for prisoners to
comply with this guidance.  (*Id.*; ECF No. 24-6, PageID.337.)

Plaintiff also alleges that JCF's cells are inadequately ventilated which allows the
COVID-19 virus to "just hang[] in the air."  (ECF. No. 6, PageID.92.)  Several prisoners
are also confined to "pole barns" with "[eight] man cubes with half walls."  (*Id.* at
PageID.91.)  Plaintiff asserts that Defendants "impl[e]mented, condoned, promul[g]ated[,]
and enforced" JCF's housing policy even though they were "fully aware" that their housing
policy subjects inmates to an "incredibly high risk of contracting COVID-19 . . . ."  (*Id.* at
PageID.91–92.)

Notwithstanding its crowded prisons, the MDOC, led by Director Heidi
Washington, has implemented several measures to mitigate the spread of COVID-19.
Indeed, just three days after Governor Whitmer declared a state of emergency on March
10, 2020, MDOC suspended in-person visitation in all Michigan prisons and prohibited all
symptomatic MDOC employees from returning to work.  (ECF No. 24-4; ECF No. 24-5,
PageID.299–300.)   Days later, the Governor issued an executive order "halt[ing] all
transfers from county jails and local lockups to MDOC."  (ECF No. 24-5, PageID.302.)
By April, MDOC had begun to develop "isolation areas" for prisoners who tested positive
for COVID-19 and prisoners who were in close contact with COVID-19 positive prisoners.
(*Id.* at PageID.302.)

2

Additionally, the MDOC provided personal protective equipment ("PPE") to all facilities.  (*Id.* at PageID.303.)  All staff and prisoners were provided masks and required to wear them.  (*Id.*)  All facilities were also provided with gowns, eye protection, gloves, hand-sanitizer, and wipes.  (*Id.* at PageID.303, 306.)  The MDOC continued to screen individuals entering the prison for symptoms of COVID-19 and it enforced social distancing in communal areas.  (*Id.* at PageID.304.)  Large gatherings, classes, transfers, cell-moves, and searches of prisoners were all suspended or limited.  (*Id.* at PageID.307–08.)

The MDOC also took steps to reduce "the number of prisoners housed in communal living arrangements."  (*Id.* at PageID.311.)  Indeed, by May 12, 2020, the MDOC reduced the total occupancy in its communal facilities from around 12,924 to 11,300.  (*Id.*)  Where feasible, prisoners who were housed in communal facilities were required to sleep "head-to-toe and every other bunk . . . ."  (*Id.*)

The MDOC's measures were enforced at JCF.  By September 15, 2020, Warden Noah Nagy required all prisoners and staff to conduct weekly COVID-19 testing.  (ECF No. 24-2, PageID.194.)  Consistent with Director Washington's guidance, Prisoners who tested positive for the virus, and any close contacts, were quarantined until they recovered from COVID-19.  (*Id.* at PageID.190–93.)  Warden Nagy also enforced social distancing in communal areas and supplied prisoners with PPE.  (*Id.* at PageID.195–98.)  Toilets, sinks, showers, and phones were regularly disinfected. (*Id.* at PageID.196.)  Because of these policies, JCF, which began the pandemic with a prisoner population of over 1,700 inmates, experienced only four deaths from COVID-19 that originated within the facility.

(*Id.* at PageID.194.)  In fact, in one area of the facility, only twenty inmates had tested positive for COVID-19 between the beginning of the pandemic and December 4, 2020. (*Id.* at PageID.194, 201.)

Plaintiff filed the present lawsuit, *pro se*, on June 2, 2020, alleging that Defendants' housing policy violated his right to Due Process under the Fifth Amendment, as well as his right to be free from cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution and Article I, § 16 of the Michigan Constitution.  (ECF No. 1, PageID.88–90.)  All defendants were sued in their individual and official capacities for both monetary and injunctive relief.  (*Id.* at PageID.89.)  On August 18, 2020, this case was stayed and referred to the Pro Se Prisoner Early Mediation Program.  (ECF No. 7.)  After the parties failed to reach a settlement, the stay was lifted, and Defendants subsequently moved to dismiss Plaintiff's claims, and, alternatively, moved for summary judgment.  (ECF Nos. 16, 24.)

### B.   Standard of Review

Defendants move to dismiss Plaintiff's entire complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  In the alternative, Defendants argue that that summary judgment is appropriate in their favor under Rule 56.

### 1.   Motion to Dismiss Standard

With Respect to Defendants motion to dismiss, Defendants first argue that dismissal of Plaintiff's official capacity claims for monetary damages is appropriate under Rule 12(b)(6) because Defendants are entitled to sovereign immunity.  However, sovereign immunity is a jurisdictional issue, and is therefore properly considered under Rule 12(b)(1).

*See Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015). Further, the sovereign immunity issue, under Rule 12(b)(1), must be addressed first because "the Rule 12(b)(6) challenge becomes moot if this court lacks subject matter jurisdiction." *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).

Under Rule 12(b)(1) a defendant may move to dismiss a complaint on the grounds that the district court lacks subject matter jurisdiction. Where subject matter jurisdiction is challenged under Rule 12(b)(1), it is the plaintiff's burden to prove that the district court has jurisdiction. *See id.* The court will accept the complaint's factual allegations as true insofar as the defendant facially challenges the "sufficiency of the pleading" itself. *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). However, the complaint's factual allegations are not presumptively true where there is a factual controversy. Instead, the court must "weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist." Here, Defendants facially challenge this Court's jurisdiction with respect to Plaintiff's official capacity claims for monetary damages because there are no material factual disputes which would affect subject matter jurisdiction.

Defendants' remaining arguments are properly brought under Rule 12(b)(6). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Accordingly, a plaintiff's complaint shall be dismissed for failure to state a claim if it lacks sufficient "factual matter (taken as true) to" provide "plausible grounds to infer" that the elements of a claim for relief could be met. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see* Fed. R. Civ. P. 12(b)(6). A

complaint must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Mere labels, conclusory statements, or "formulaic recitations" of the elements of a cause of action are not sufficient to meet this burden if they are unsupported by adequate factual allegations. *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The requirement to provide a plausible claim does not require that a claim be "probable"; however, a claim must be more than merely "conceivable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–80 (2009).

## 2.   Summary Judgment Standard

When a movant shows that "no genuine dispute as to any material fact" exists, the court will grant his or her motion for summary judgment. Fed. R. Civ. P. 56(a). In reviewing such motion, the court must view all facts and inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears "the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted). In making its determination, a court may consider the plausibility of the movant's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party cannot meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot rest merely on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence"

to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993).   The non-movant cannot withhold evidence until trial or rely on speculative possibilities that material issues of fact will appear later.   10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2739 (3d ed. 1998).   "[T]o withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas v. Am. Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010).   In doing so, the non-moving party cannot simply assert that the other side's evidence lacks credibility. *Id.* at 493.

### C.     Analysis

#### 1.     Sovereign Immunity

The Eleventh Amendment to the United States Constitution provides that no citizen of the United States shall commence a suit against any state. U.S. Const. amend. XI.; *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974).   It is well established that a suit against a state officer in his or her official capacity is a suit against the entity he or she represents. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).   Therefore, by suing Defendants, who are all officials of the state of Michigan, Plaintiff is effectively suing the State of Michigan. *Martinko v. Whitmer*, 465 F. Supp.3d 774, 776 (E.D. Mich. 2020) ("A suit against Michigan's governor in her official capacity is a suit against the state itself . . . ."); *Bell v. Admin. Bd. of Claims*, No. 20-cv-10193, 2020 WL 2525827, at *5 n.6 (E.D. Mich. May 18, 2020) ("Director Washington and Warden Lindsey are also MDOC employees entitled to sovereign immunity . . . ."); *Turnboe v. Stegall*, No. 00-1182, 2000

WL 1679478, at *2 (6th Cir. Nov. 1, 2000) ("[T]he MDOC, as an arm of the State of Michigan, is entitled to sovereign immunity.").

Accordingly, I suggest that, under the Eleventh Amendment, this Court lacks subject matter jurisdiction over Plaintiff's official capacity claims against Defendants, insofar as Plaintiff requests monetary damages. *See Ex parte Young*, 209 U.S. 123, 148 (1908) (holding that the Eleventh Amendment does not prohibit suits against states for injunctive relief); *Timmer v. Mich. Dep't of Commerce*, 104 F.3d 833, 836 (6th Cir. 1997) ("It is well established that § 1983 does not abrogate the Eleventh Amendment and that Michigan has not consented to the filing of civil rights suits against it in federal court.").

### 2. Qualified Immunity

### a. Consideration of Defendants' Exhibits

Defendants next argue that, under Rule 12(b)(6), or, alternatively, Rule 56, they are entitled to qualified immunity because (1) they did not violate Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment, and (2) even if they had violated this right, the right was not clearly established. Defendants attach six exhibits in support of their motion to dismiss and their motion for summary judgment.[2] Accordingly,

---

[2] Plaintiff argues that Defendants are liable in their personal capacities for "implement[ing], condon[ing], promul[gating,] and enforce[ing]" a mass housing policy that increases Plaintiff's risk of contracting COVID-19 and other respiratory illnesses. (ECF No. 6, PageID.91.) To the extent that Plaintiff alleges that Defendants are liable for the conduct of their subordinates under *respondeat superior*, I suggest that Plaintiff has failed to state a plausible claim for relief as it is well established that *respondeat superior* is inapplicable to § 1983 claims. *Ashcroft*, 556 U.S. at 676. Insofar as Plaintiff argues that defendants, themselves, created and implemented the policy at issue, I suggest that, even if supervisors can be held personally liable under § 1983 for implementing broad policies, defendants are not liable in any capacity because they are protected by qualified immunity. *Compare Good v. Goodell*, No. 2:19-cv-222, 2020 WL 880956, at *6–7 (W.D. Mich. Feb. 24, 2020) (suggesting that a state officer can be held liable in his or her individual capacity for "creating' or "maintaining" broad policies) *with Harvey v. Campbell County, Tenn.*,

this Court must first determine the threshold issues of (1) whether these exhibits can be considered at the 12(b)(6) stage, and (2) if not, whether summary judgment would be premature before the parties have had an opportunity to conduct discovery.

First, Defendants' proposed exhibits may not be considered by this Court at the 12(b)(6) stage. Generally, when deciding a motion to dismiss for failure to state a claim, courts may only look to the pleadings themselves. *Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir. 1989). However, a court *may* also consider matters of public record that are not mentioned in the complaint if they are "appropriate for the taking of judicial notice." *New Eng. Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003); *accord Bailey v. City of Ann Arbor*, 860 F.3d 382, 386 (6th Cir. 2017). A court may take judicial notice of a fact that (1) is not "subject to reasonable dispute" and (2) can "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Hill v. Whitmer*, No. 20-1835, 2021 WL 3877920, at *2 (6th Cir. 2021) (Daughtrey, J., dissenting) (quotation marks omitted) (quoting Fed. R. Evid. 201(b)(2)).

Here, defendants rely on their own affidavits from prior litigation to argue that they took reasonable steps to mitigate the risk posed to inmates by COVID-19. Even though these affidavits are public records, they are not records which are "appropriate for the taking of judicial notice." *Bailey*, 860 F.3d at 386. Indeed, these self-serving affidavits are inherently suspect—it is the Defendants themselves describing the steps they took in

---

453 F. App'x 557, 563 (6th Cir. 2011) (holding that municipal officials can only be held liable in their official capacities for creating policies).

response to COVID-19.   *Cf. Hill*, 2021 WL 3877920, at *3 (Daughtrey, J., dissenting). *See generally KatiRoll Co., Inc. v. Kati Junction, Inc.*, 33 F. Supp.3d 359, 365 (S.D.N.Y. 2014).  A source with an interest in the outcome of the litigation is not one "whose accuracy cannot reasonably be questioned."  *See Hill*, 2021 WL 3877920, at *3 (Daughtrey, J., dissenting).  *See generally* Wright & Miller, *supra*, § 1366 ("[T]he 1948 Advisory Committee Notes indicate, the amendment of Rule 12([d]) was designed to . . . sanction[] the growing practice of accepting matters outside the pleading on Rule 12(b)(6) motions, and . . . [t]he Note also makes it clear that this provision was not intended to permit the resolution of disputes on the basis of affidavits and other pretrial data when there is a material issue of fact that justifies a trial on the merits.").  The purpose of a 12(b)(6) motion is to analyze the sufficiency of the pleadings on their face.  *Ashcroft*, 556 U.S. at 678. While the Court need not ignore trustworthy and publicly known facts, a party's own affidavits would typically only be considered at the Rule 56 stage.  *See KatiRoll Co., Inc.*, 33 F. Supp.3d at 365.  Defendants cannot circumvent the scope of Rule 12(b)(6) simply because these affidavits have been used in prior litigation.

Accordingly, defendant's motion to dismiss should be construed as a motion for summary judgment.  Fed. R. Civ. P. 12(d).[3]  Although the parties have not yet conducted discovery, this Court should nonetheless consider Defendant's motion for summary judgment.  Under Rule 12(d), where a motion to dismiss is construed as a motion for

---

[3] While several of Defendants' other exhibits would constitute matters of public record of which the Court may take judicial notice, Rule 12(d) still requires that Defendants' motion be construed as a motion for summary judgment because the affidavits, which defendants' motion relies heavily on, are "matters outside the pleadings."

summary judgment, the parties be "given a reasonable opportunity to present all evidence that is pertinent to the motion" before a motion for summary judgment can be considered. Here, although Plaintiff has not presented any evidence to support his pleadings, he has been given a reasonable opportunity to do so. This Court provided Plaintiff with four weeks to respond to Defendants' motion for summary judgment. (ECF No. 26.) This should have provided Plaintiff with enough time to, at the very least, file an affidavit in support of his response. *See* Mich. Dept. of Corrections, Policy Directive No. 05-03-116(G) (May 3, 2014) (requiring that all prisoners have access to a notary public). Further, even if Plaintiff could not have gathered support for his response within the four weeks, he could have requested this Court to grant him additional time to take affidavits or conduct other discovery under Rule 56(e). Plaintiff has made no such request. *See generally Branham v. Micro Computer Analysts*, 350 F. App'x 35, 38 (6th Cir. 2009) (quoting *McNeil v. United States,* 508 U.S. 106, 113 (1993)) ("[F]ederal courts 'have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel.'").

I also recognize that Defendants' qualified immunity defense should be considered as early as possible. Qualified immunity provides government officials with "immunity from suit rather than a mere defense to liability. . . ." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). This immunity from suit includes not just immunity from trial, but also from costly discovery. *Skousen v. Brighton High School*, 305 F.3d 520, 526 (6th Cir. 2002). Accordingly, "[t]o avoid imposing needless discovery costs upon government officials, the determination of qualified immunity must be made at an early stage in the litigation." *Id.*

11

Because I ultimately conclude that Defendants are entitled to qualified immunity, notwithstanding their practice of "mass housing," I see no reason to defer summary judgment so that Plaintiff can support a factual assertion that is not material—doing so would needlessly frustrate Defendants' interest in immunity from suit. *See id.* at 527 (instructing that where no material facts are in dispute, courts must rule on a motion for summary judgment before allowing discovery if defendants raise qualified immunity as a defense). Thus, I suggest that summary judgment would not be premature because Plaintiff has had a reasonable opportunity to supply the Court with evidence to support his factual assertions—none of which are material to Defendants' motion.

Because Plaintiff has failed to support his response with evidence of Defendants' "mass housing" policy, Plaintiff has not raised a genuine dispute of material fact, and Defendants' motion should be granted. Federal Rule of Civil Procedure 56(c) requires that where a party asserts "that a fact cannot be or is genuinely disputed," the party's assertion must be properly supported by "materials in the record" including depositions, admissions, declarations, or affidavits. A party cannot rely on its pleadings to oppose a motion for summary judgment. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); Fed. R. Civ. P. 56(e) advisory committee's note to the 1963 amendment. However, this is exactly what Plaintiff does. Instead of providing the court with evidence to support his

response, Plaintiff simply rests on the allegations in his complaint.[4]   Therefore, Plaintiff has not properly supported his response with any facts that would raise a genuine dispute.[5]

In this situation, the Court has the discretion to either grant summary judgment or give the party an opportunity to properly support or address the fact at issue.  Fed R. Civ. P. 56(e).  Here, however, granting Plaintiff an opportunity to support his motion would be futile because he does not dispute Defendants' factual assertions, and the existence of Defendants' "mass housing" policy, even if disputed, is not material.  Indeed, even if Plaintiff could show that there is no genuine dispute that Defendants' housing policy increased his risk of contracting COVID-19 or another respiratory illness, his argument would still fail because Defendants are entitled to qualified immunity.

### b. The Merits of Defendants' Qualified Immunity Defense

With this threshold issue addressed, I turn to the merits of Defendants' motion for summary judgment. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (1999) (quotation marks omitted). It is the Plaintiff's burden to demonstrate that the defendant violated a clearly established constitutional right.  *Clark v. Stone*, 998 F.3d 287, 298 (6th Cir. 2021).   Here, Defendants

---

[4] These bare assertions regarding Defendants' housing policy do not constitute declarations or affidavits under Rule 56(c) because they are neither confirmed by "oath or affirmation" nor taken "before a person having authority to administer . . . an oath or affirmation."  *Amin v. Loyola U. Chicago*, 423 F. Supp.2d 914, 916 (W.D. Wis. Mar. 31, 2006); *see Moldowan*, 578 F.3d at 374 (holding that mere pleadings are insufficient to raise a genuine dispute of material fact).

[5] I reiterate that Plaintiff could have, but failed to, request additional time to support his response under Rule 56(e).

are entitled to qualified immunity because their COVID-19 response did not violate Plaintiff's Eighth Amendment rights.  Further, even if Defendants had violated Plaintiff's Eighth Amendment rights, Defendants are still entitled to qualified immunity because their conduct did not violate a clearly established right.[6]

### 1. Eighth Amendment Claim

The Eighth Amendment protects all people from "cruel and unusual punishments."[7] U.S. Const. amend. VIII.   While "[t]he Constitution 'does not mandate comfortable prison[s],'" it also does not "permit inhumane ones, and . . . 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'"  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotation marks omitted).  Indeed, "when the State takes a person into its custody and holds him

---

[6] Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Still, the Supreme Court has recognized, in dicta, that "[w]hen qualified immunity is asserted at the pleading stage" the "clearly established" prong of the analysis should be addressed first because "the precise factual basis for the plaintiff's claim or claims may be hard to identify." *Id.* at 238–39; *See Clark*, 998 F.3d at 298.  However, these concerns are not present in the instant case. Plaintiff has clearly identified the aspects of Defendants' COVID-19 response which he believes violate his Eighth Amendment rights, and the Defendants have supplied several exhibits detailing their COVID-19 response.  Additionally, I recognize that here, addressing the constitutional question first would (1) help define the precise constitutional right at issue and (2) help "prevent constitutional stagnation."  *Pearson*, 555 U.S. at 236.

[7] Plaintiff also alleges that Defendants' housing policy violated his "Fifth Amendment" right to Due Process.  (ECF No. 6, PageID.88.)  Of course, because Defendants are state officials, they are bound by the Due Process Clause of the Fourteenth Amendment, not the Fifth Amendment.  *Betts v. Brady*, 316 U.S. 455, 462 (1942).  Even so, the Eighth Amendment, not the Due Process Clause of the Fourteenth Amendment, is the proper vehicle for Plaintiff's claim.  Where there is a Constitutional provision that explicitly provides some protection, that protection is exclusively analyzed under its corresponding constitutional provision.  *Albright v. Oliver*, 510 U.S. 266, 273 (1994).  Here, "the Eighth Amendment is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions"—including deliberate indifference to a prisoner's medical needs or safety—and it "serves as the primary source of substantive protection to convicted prisoners . . . ."  *Whitley v. Albers*, 475 U.S. 312, 327 (1986); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  Therefore, Plaintiff's claims are not cognizable under the Fourteenth Amendment.

there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well[-]being." *Wilson v. Williams*, 961 F.3d 829, 839 (6th Cir. 2020). This includes a duty to provide for the prisoner's "basic human needs," including "food, clothing, shelter, medical care, and reasonable safety." *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)).

An "official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). For an inmate to show that an official acted with "deliberate indifference" to a "substantial risk of serious harm," he must show (1) "that he is incarcerated under conditions posing a substantial risk of serious harm," and (2) that the defendant knew "of and disregard[ed] an excessive risk to inmate health or safety." *Id.* at 834, 837. Under the second prong, "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. However, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

Here, the first prong is not seriously at issue. Defendants do not dispute that COVID-19 poses "a substantial risk of serious harm." And for good reason. The Sixth Circuit has recognized that COVID-19 "creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death" particularly in prisons where inmates are housed in close proximity to other prisoners. *Wilson*, 961 F.3d at 829.

Thus, the issue turns on whether defendants responded reasonably to the risk posed by the COVID-19 virus and other contagious diseases. In *Hill v. Whitmer*, the Sixth Circuit

held that a prisoner did not plausibly allege that Governor Whitmer, Director Washington, and the Warden of the Central Michigan Correctional Facility responded unreasonably to the COVID-19 pandemic even though he was confined to a cell where social distancing was impossible.  2021 WL 3877920, at *1–2.  The prisoner alleged that the defendants ignored the Governor's orders requiring proper social distancing by confining him "in a cube setting with seven other inmates in a [twelve by twenty] foot area."  *Id.* at *1.  The Sixth Circuit reasoned that the defendants did not act with "deliberate indifference" because their overall response to the COVID-19 pandemic was reasonable.  *Id.*  These steps included "providing prisoners with free facial masks and soap, enhancing the sanitation process, providing free COVID-19 testing for symptomatic prisoners, and prohibiting prisoners from gathering in groups or engaging in group sports."  *Id.*  Further "[p]risoners that contracted COVID-19 or were exposed to someone who contracted COVID-19 were isolated, [a]nd prisoners with COVID-19 were required to recover from any symptoms, pass a COVID-19 test, and receive clearance from MDOC's chief medical officer before they could reintegrate."  *Id.*

The COVID response at issue is nearly identical to the one in *Hill*.  Indeed, it concerns the same directives from Governor Whitmer and Director Washington.  *Compare Hill v. Whitmer*, No. 1:20-cv-372, 2020 WL 2569711, at *2–3 (W.D. Mich. May 21, 2020), *with* (ECF No. 24-5, PageID.299–309.)  In the prison itself, Warden Nagy took substantial steps to implement Whitmer and Washington's directives and mitigate the risk posed by COVID-19.  Specifically, by September 15, 2020, Warden Nagy required all prisoners and staff to conduct weekly COVID-19 testing.  (ECF No. 24-2, PageID.194.)  Prisoners who

16

tested positive for the virus, as well as any prisoners with whom they had close contact, were quarantined in accordance with CDC guidance. (*See id.*)  Additionally, Warden Nagy has implemented numerous social distancing measures at JCF.  Prisoners do not eat in a common area; rather, they visit their unit's food service area, collect their meal, and return to their unit to eat. (*Id.* at PageID.195–96.)  Prisoners are also reminded to stay at least six feet away from each other whenever feasible, and in several common areas, the floors are marked every six feet to help prisoners remain socially distanced. (*Id.* at PageID.197–98, 231–45.)  Shared amenities such as toilets, sinks, showers, and phones are regularly disinfected. (*Id.* at PageID.196.)  Prisoners are also provided with an adequate supply of masks and hand sanitizer. (*Id.* at PageID.197–200.)

These measures appear to have been successful.  As of December 4, 2020, out of a prison population of 1,606 prisoners, only four prisoners had died from COVID-19 that originated in JCF, and only twenty had tested positive for the virus in one part of the facility. (*Id.* at PageID.188–89, 201.)  Of course, it is impossible for defendants to completely eliminate the risk posed by COVID-19, and they are not expected to do this. *See Wilson*, 961 F.3d at 841, 844.  Rather, defendants are required to take reasonable steps to mitigate the risk posed by the virus. *Id.* at 841 (citing *Farmer*, 511 U.S. at 844).  The novel coronavirus has imposed an unprecedented challenge on the world, and the appropriate measures to mitigate the risk imposed by the virus are far from clear.  This is especially true in the prison setting where officials must deal with the virus while simultaneously managing thousands of inmates.  Given the unique challenges imposed on the defendants, their general compliance with CDC regulations, and their extensive and

17

successful measures in responding to the pandemic, I suggest that defendants responded reasonably to the pandemic and therefore did not violate Plaintiff's Eighth Amendment rights. *Cf. Hill*, 2021 WL 3877920, at *2.

In his response, Plaintiff clarifies that he is only challenging JCF's housing policy, and argues, therefore, that the other aspects of the Defendants' COVID-19 policies are not relevant to his Eighth Amendment claim. (ECF No. 27, PageID.368–69.) Effectively, he asks that this Court ignore the totality of Defendants' response to the COVID-19 pandemic and scrutinize one aspect of their response in a vacuum. This the Court cannot do. The Court cannot accurately assess whether defendants reasonably responded to the COVID-19 pandemic without analyzing the entirety of their COVID-19 response. *See Wilson*, 961 F.3d at 839–44 (analyzing the defendants' COVID-19 response under the Eighth Amendment by looking analyzing the totality of their response). To be sure, Defendants' housing policy is relevant to this analysis, but it is not dispositive. *See id.* And, given the extensive and largely successful measures taken by Defendants to mitigate the risk posed by COVID-19, I suggest that they responded reasonably to the pandemic, notwithstanding the close proximity of cellmates.

Plaintiff also argues that Defendants not only put him at an unreasonable risk of contracting COVID-19, but also other contagious diseases, such as influenza, the common cold, or potential future pandemics. (ECF No. 27, PageID.370–71, 373–74.) First, unlike COVID-19, influenza and the common cold do not generally "pose a substantial risk of serious harm." The COVID-19 virus has an overall mortality rate of 1.6%. *Compare COVID Data Tracker Weekly Review*, Centers for Disease Control and Prevention,

18

https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html            (last visited Oct. 15, 2021) (reporting total COVID-19 cases in the United States), *with Weekly Updates by Select Demographic and Geographic Characteristics*, Centers for Disease Control and Prevention, https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm (last visited Oct. 15, 2021) (reporting total COVID-19 deaths in the United States).   By comparison, the overall mortality rate of the influenza virus is .096%.   *See Estimated Flu-Related Illnesses, Medical visits, Hospitalizations, and Deaths in the United States—2018– 2019 Flu Season*, Centers for Disease Control and Prevention, https://www.cdc.gov/flu/about/burden/2018-2019.html (last visited Oct. 15, 2021). Absent unique circumstances, influenza, much less the common cold, does not pose any serious risk of harm, and Plaintiff has not alleged that he has medical conditions making him unusually vulnerable to these diseases.   *See id.*   Further, even if the flu and the common cold did generally "pose a substantial risk of serious harm," the measures taken by defendants to protect Plaintiff against COVID-19 would also be adequate to protect him from the cold and influenza, which are significantly less contagious than COVID-19.   S*ee Similarities and Differences Between Flu and COVID-19*, Centers for Disease Control and Prevention, https://www.cdc.gov/flu/symptoms/flu-vs-covid19.htm (last visited Oct. 19, 2021).

Second, to the extent that Plaintiff argues that Defendants should have required around-the-clock social distancing as a prophylactic measure to protect inmates from future pandemics, I suggest that this argument fails.   The COVID-19 pandemic was unprecedented.   Although Plaintiff argues that past pandemics, such as the bubonic plague

and the Spanish flu, should have put prison officials on notice that a future pandemic was likely, no reasonable person would have anticipated the COVID-19 pandemic.  (ECF No. 6, PageID.92, 95.)  The existence of a similar pandemic, over a century ago, could not have reasonably led anyone to believe that constant social distancing would be a necessary protective measure to prevent a pandemic similar to the Spanish flu.  Indeed, it is difficult to see how social distancing could prevent the spread of a pandemic *before* it begins.  For these reasons I suggest that Plaintiff has failed to raise a genuine dispute as to any material facts, and, as a matter of law, Defendants were not deliberately indifferent to the COVID-19 pandemic such that they violated Plaintiff's Eighth Amendment rights.  Accordingly, because defendants did not violate Plaintiff's Eighth Amendment rights, I suggest that they are entitled to qualified immunity.

## 2. Whether Defendants Violated a Clearly Established Right

Even if Defendants violated Plaintiff's right to be protected from contagious diseases, I suggest Defendants are still entitled to qualified immunity because this right was not clearly established in this context.  "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  The inquiry into whether a right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition; and it serves to advance understanding of the law . . . ."  *Id.* at 201.  The right at issue must be clearly established "in a more particularized, and hence more relevant sense: [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*,

483 U.S. 635, 640 (1987); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). The facts are to be "viewed in the light most favorable to the plaintiff[.]" *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005).

In *Tate v. Arkansas Dep't of Corrections*, the Eastern District of Arkansas held that a prisoner did not state a plausible claim for relief by alleging that prison officials inadequately responded to the COVID-19 pandemic. No. 4:20-cv-558, 2020 WL 7378805, at *11 (E.D. Ark. Nov. 9, 2020). The prison officials in *Tate* took several precautionary measures in response to the pandemic, such as suspending invitation, providing cloth masks and soap to prisoners, encouraging social distancing in common areas, quarantining COVID-19 positive inmates, and monitoring inmates' temperatures. *Id.* at *6–8. The Court reasoned that even if the measures taken by prison officials were inadequate for Eighth Amendment purposes, the prison officials were still entitled to qualified immunity because the prisoner's right to be protected from COVID-19 was not clearly established. *Id.* at *11. The Court recognized that because "COVID-19 is, by definition, a 'novel' coronavirus" which [has] posed challenges "unlike any other in the modern era," a "reasonable official[]" could not have known if the defendants' COVID-19 response violated the prisoner's clearly established rights. *Id.*

Similarly, here, a reasonable official could not have known whether Defendants' conduct violated Plaintiff's Eighth Amendment rights. While the Eighth Amendment requires that prison officials respond reasonably to known, serious risks to a prisoner's

health or safety, the question here is whether a reasonable official could have known whether Defendants' COVID-19 measures were a reasonable response to the pandemic. *See Saucier v. Katz*, 533 U.S. at 201. However, a reasonable official could not have known whether their COVID-19 response would have violated Plaintiff's Eighth Amendment rights. COVID-19 is unprecedented, and humanity's knowledge of the disease has evolved drastically over the course of the pandemic. *See Tate*, 2020 WL 7378805, at *11. Accordingly, official guidance on recommended safety measures is continuously changing. For example, masks, a now ubiquitous safety measure, were once believed to only be effective in certain medical settings. *See Fact check: Outdated video of Fauci saying "there's no reason to be walking around with a mask"*, Reuters, October 8, 2020, https://www.reuters.com/article/uk-factcheck-fauci-outdated-video-masks/fact-checkoutdated-video-of-fauci-saying-theres-no-reason-to-be-walking-around-with-a-mask-idUSKBN26T2TR. The world's understanding of COVID-19 in constantly evolving, and there is no precedent that would have made it clear to a reasonable official that the measures Defendants took unreasonably responded to the COVID-19 pandemic.

With respect to other diseases, such as influenza, the common cold, and potential future pandemics, I suggest that under the facts of this case, Plaintiff had no clearly established right to be protected against these diseases. Neither the Supreme Court nor the Sixth Circuit has addressed whether Prisoners have a clearly established right to be protected from all contagious diseases. And, while some courts have found that prisoners have a clearly established right to not be exposed to known, contagious, and serious diseases, prisoners do not have a clearly established right to prophylactic social distancing

to prevent disease in general, much less innocuous diseases like the cold or influenza.  *Cf.*

*Loftin v. Dalessandri*, 3 F. App'x 658, 663 (10th Cir. 2001) (recognizing an Eighth

Amendment claim for knowingly housing the defendant in a cell with individuals who had

tested positive for tuberculosis).  No reasonable prison official would think that they are

required to provide constant social distancing to prevent diseases that pose no serious risk

to inmates.  Accordingly, I suggest that Defendants are entitled to qualified immunity

because they did not violate a clearly established right.[8]

## III.   Conclusion

For the reasons above, I **RECOMMEND** that the Court **GRANT** Defendants'

motion.

## IV.   Review

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14

days after being served with a copy of the recommended disposition, a party may serve

and file specific written objections to the proposed findings and recommendations.  A

party may respond to another party's objections within 14 days after being served with a

copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific

objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S.

---

[8] If the Court grants summary judgment in favor of Defendants with respect to Plaintiff's Eighth Amendment claims, then I recommend that the Court also decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claim.  *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1998) ("[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."); *Gamel v. City of Cincinnati*, 625 F.3d 949, 951–52 (6th Cir. 2010) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims or remanding them to state court if the action was removed.").  I suggest that Plaintiff's state law claim be dismissed without prejudice.

140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: October 25, 2021          S/ PATRICIA T. MORRIS
                                Patricia T. Morris
                                United States Magistrate Judge