UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| SEAN MICHAEL RYAN,<br><br>    Plaintiff,<br><br>v.<br><br>NOAH NAGY,<br>HEIDI WASHINGTON, and<br>GRETCHEN WITMER,<br><br>    Defendants. | Case No. 20-11528<br>Honorable Laurie J. Michelson<br>Mag. Judge Patricia T. Morris |

**OPINION AND ORDER
ADOPTING IN PART REPORT AND RECOMMENDATION [28],
GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS OR FOR SUMMARY JUDGMENT [24] AND
GRANTING PLAINTIFF'S MOTION TO DEFER SUMMARY-
JUDGMENT RULING [31]**

Sean Ryan is an inmate at the G. Robert Cotton Correctional Facility (JCF), a Michigan Department of Corrections prison located in Jackson, Michigan. Ryan alleges that many inmates at JCF have one of two sleeping arrangements: either two inmates share a cell designed for one person or many inmates share a pole barn. Apparently, a pole barn is a large building; and within a pole barn, there are multiple cubicles defined by half walls; and within a cubicle, there are beds for eight inmates.

Ryan believes that the shared living quarters at JCF are unconstitutional. He says that because inmates must share sleeping and living space, they are exposed to contagious diseases including, but not limited to, COVID-19. Ryan alleges that despite knowing that inmates are at risk of contracting diseases like COVID-19,

Michigan Governor Gretchen Whitmer, MDOC Director Heidi Washington, and JCF Warden Noah Nagy maintain a policy or practice of requiring two people to share a single-person cell or requiring eight people to share a cube in a pole barn. Ryan believes this policy or practice violates the Eighth Amendment of the U.S. Constitution and the analogous provision of the Michigan Constitution. So, soon after the start of the COVID-19 pandemic, Ryan filed this lawsuit.

Although the parties did not complete discovery, Defendants have filed a motion to dismiss and, in the alternative, for summary judgment. Magistrate Judge Patricia T. Morris, who has been referred all pretrial matters in this case, treated Defendants' motion as one for summary judgment. And she recommends that this Court grant summary judgment. Not only does Ryan object to that recommendation, he also asks this Court to defer ruling on Defendants' summary-judgment motion so he can conduct discovery.

Having considered Defendants' motion, the report and recommendation, and Ryan's motion to defer a summary-judgment ruling, the Court will grant in part and deny in part Defendants' motion. In particular, to the extent that Ryan seeks damages, no precedent gave Defendants clear notice that the housing situation at JCF was unconstitutional because it exposed inmates to contagious diseases. So to the extent that Ryan seeks backward-looking relief, the Court will dismiss Ryan's claims. But to the extent that Ryan seeks a forward-looking injunction, the Court prefers a more complete record before ruling. So the Court will not dismiss Ryan's claims insofar as they seek prospective relief.

I.

As an initial matter, the Court takes a moment to state its understanding of Ryan's claim.

According to Defendants, Ryan claims that they should have taken preemptive measures against COVID-19. Defendants' motion states, "The right at issue in this case is whether the Defendants should have taken preemptive steps to reduce the population at JCF, such as implementing physical and structural changes to the prison with a limited budget, due [to] the possibility of a pandemic." (ECF No. 24, PageID.178–179; *see also id.* at PageID.176.)

But Ryan's complaint is not limited to asserting that Defendants did not take adequate measures in anticipation of something like COVID-19. True, Ryan does maintain that Defendants "should have known for years" that multiple-person housing subjects inmates to an "incredibly high risk of contracting any viral or bacterial infection that is air borne." (ECF No. 6, PageID.92.) But Ryan's amended complaint, filed months into the COVID-19 pandemic, also clearly seeks a forward-looking injunction against multi-person housing. (ECF No. 6, PageID.98.) So Ryan's complaint also challenges the *continued* use of multi-person housing *after* Defendants were aware of the COVID-19 pandemic.

Defendants also direct the Court to affidavits that explain measures taken throughout JCF to mitigate COVID-19. For instance, in one of his affidavits, Nagy explains that inmates at JCF have received reusable masks (ECF No. 24-2, PageID.198), have an adequate supply of hand soap (*id.* at PageID.199), wear masks

3

during "yards" and meal lines (*id.* at PageID.200), are served a "Styrofoam food tray and return to their unit to eat" (*id.* at PageID.195), are isolated if they are infected with COVID-19 (*id.* at PageID.193–194), and are tested for COVID-19 on a weekly basis (*id.* at PageID.189).

While Ryan's complaint could have been drafted more clearly, Ryan does not primarily claim that JCF's COVID-19 measures as a whole have been inadequate. Instead, Ryan homes in on a specific aspect of JCF: he says that the policy or practice of "double bunking inmates in cells made for one person as well as pole barns with 8 man cubes" violates the Eighth Amendment and Michigan's corresponding constitutional provision. (ECF No. 6, PageID.91.) Ryan refers to this multi-person housing as "mass housing," and claims that the policy or practice of "'mass housing' . . . inflict[s] cruel and unusual punishment upon Plaintiff and other similarly situated inmates." (ECF No. 6, PageID.96.) And to the extent that Ryan did complain about the overall COVID-19 mitigation efforts at JCF, in his response to Defendants' dispositive motion, he made clear that this lawsuit centers on shared housing: "the amended complaint alleges that the defendants have . . . been deliberately indifferent to Plaintiff's serious medical needs by subjecting him to the risk of contracting a contagious disease by . . . requiring double bunking and cube style housing for inmates throughout the MDOC." (ECF No. 27, PageID.366–367.)

In short, in this Court's opinion, this lawsuit raises two parallel claims under federal and state law: Defendants, despite being aware of the existence of contagious diseases (including, presently, COVID-19), maintain a policy or practice of requiring

4

inmates to share a cell or a pole-barn as sleeping and living quarters in violation of the Eighth Amendment of the federal Constitution and Article I, § 6 of the Michigan Constitution. (Ryan's complaint also references the Fifth Amendment's Due Process Clause (ECF No. 6, PageID.90), but the Court agrees with the Magistrate Judge that no substantive due process claim exists given the express protections of the Eighth Amendment. *Albright v. Oliver*, 510 U.S. 266, 273 (1994).) And if the Court finds that the multi-person housing practice is unconstitutional, Ryan asks for (1) an injunction to end the multi-person housing practice and (2) damages for his mental and emotional distress caused by the practice. (ECF No. 6, PageID.98.)

II.

Of the two types of relief—backward-looking damages and a forward-looking injunction—the Court starts with damages.

Defendants have raised qualified immunity (ECF No. 24, PageID.176), a doctrine that, when it applies, bars suits against state officials for money damages. The doctrine seeks to balance competing interests: "hold[ing] public officials accountable when they exercise power irresponsibly" while "shield[ing] officials from harassment, distraction, and liability when they perform their duties reasonably." *Schulkers v. Kammer*, 955 F.3d 520, 533 (6th Cir. 2020). "Reasonably" does not mean "correctly"—officers are allowed to make reasonable but mistaken judgment calls when operating in gray areas. *See id.* That means to overcome qualified immunity, Ryan must show that Defendants violated "clearly established" law. *See id.* Although Ryan need not identify precedent that is "directly on point," generally speaking, he

5

must "identify a case with a fact pattern similar enough to have given 'fair and clear warning to officers' about what the law requires." *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)).

To this end, *Ryan* directs the Court to two cases: *Hutto v. Finney*, 437 U.S. 678 (1978), and *Helling v. McKinney*, 509 U.S. 25 (1993).

Neither case clearly establishes that requiring two people to share a one-person cell, or requiring many people to share a pole barn, violates the Eighth Amendment because it exposes the inmates to contagious diseases. In *Hutto*, one of the several conditions that violated the Eighth Amendment was how inmates were housed: "an average of 4, and sometimes as many as 10 or 11, prisoners were crowded into [a] windowless 8′x10′ cell," and the prisoners were forced to reuse the same mattresses for sleeping despite "some of them [having] infectious maladies such as hepatitis and venereal disease." 437 U.S. at 682. Ryan has not alleged even remotely comparable conditions at JCF. The situation in *Hutto*—four to 11 people in an 8-by-10-foot cell, where the same set of mattresses were reused—is simply not comparable to two people in a one-person cell each with their own bunkbed or many people in a pole barn each with their own bed or bunkbed. So *Hutto* did not give Defendants clear notice that the multi-person housing at JCF is unlawful. And while Ryan cleverly analogizes the circumstances at JCF to the circumstances in *Helling*, the lawfulness of constant exposure to secondhand smoke does not give clear guidance about the lawfulness of possible exposure to airborne disease. *Cf.* 509 U.S. at 28 ("The

6

complaint . . . alleged that respondent was assigned to a cell with another inmate who smoked five packs of cigarettes a day.").

Perhaps more factually analogous than *Hutto* or *Helling* is a case that the Magistrate Judge uncovered, *Loftin v. Dalessandri*, 3 F. App'x 658 (10th Cir. 2001). There, jailers knew that two detainees had tested positive for tuberculosis—"a communicable and potentially deadly disease that generally affects the lungs"—but still kept the plaintiff in a cell with the two detainees. 3 F. App'x 660–61. The Tenth Circuit found that the "plaintiff's claims have an arguable basis under the Eighth Amendment." *Id.* at 663. But even *Loftin* is not all that similar to this case. While COVID-19 and tuberculosis might be comparable, Ryan does not allege that JCF staff allowed inmates who they knew had tested positive for COVID-19 to continue to room with him. In any event, it is highly doubtful that a single, unpublished, out-of-circuit opinion clearly establishes anything in the Sixth Circuit. *Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020) ("[W]e can't expect officers to keep track of persuasive authority from every one of our sister circuits. They spend their time trying to protect the public, not reading casebooks.").

In short, the Court agrees with the Magistrate Judge that "Defendants are entitled to qualified immunity because they did not violate a clearly established right." (ECF No. 28, PageID.407.)

That almost disposes of Ryan's request for damages. But Ryan has sued Whitmer, Washington, and Nagy not only in their individual capacities, but also in their official capacities. (ECF No. 6, PageID.89.) And qualified immunity does not

7

apply to official-capacity suits. *United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 484 (6th Cir. 2014). But, as the Magistrate Judge correctly found, official-capacity suits are, effectively, suits against the state, and so sovereign immunity bars those suits when they seek money damages. *See WCI, Inc. v. Ohio Dep't of Pub. Safety*, 18 F.4th 509, 513 (6th Cir. 2021).

\* \* \*

In sum, to the extent that Ryan seeks money damages in this case, his complaint will be dismissed.

### III.

That leaves Ryan's request for prospective, injunctive relief.

Neither qualified immunity nor sovereign immunity bars suits against state officers for prospective, injunctive relief. *Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 417 (6th Cir. 2019). So the absence of clearly established law does not carry the day for Defendants to the extent that Ryan seeks to change things moving forward.

No matter, say Defendants; in their view, MDOC's response to the COVID-19 pandemic has been commendable or, at the least, has exceeded the constitutional minimum set by the Eighth Amendment. In making this argument, Defendants rely heavily on three affidavits prepared for and filed in other cases: two by Nagy (JCF's warden) and one by Washington (MDOC's director).

The Magistrate Judge correctly determined that these affidavits were not proper for consideration under Rule 12(b)(6). The Magistrate Judge explained, "While

8

the Court need not ignore trustworthy and publicly known facts, a party's own affidavits would typically only be considered at the Rule 56 stage." (ECF No. 28, PageID.394.) Exactly right. Testimony by a defendant is not transformed into the type of "public record" proper for consideration under Rule 12(b)(6) simply because it is docketed in another case. *See Klas Mgmt., LLC v. Chubb Custom Ins. Co.*, No. 2:17-CV-12663, 2018 WL 3159676, at *4 (E.D. Mich. June 28, 2018) ("[F]or a statement in a public record (or the like) to be accepted as true at the pleading stage, it must be that the statement is not 'subject to reasonable dispute,' i.e., it is fit for judicial notice.").

The upshot of deciding that the affidavits were not proper Rule 12(b)(6) material is that the Magistrate Judge faced a choice: either exclude the affidavits (and potentially Defendants' other extra-complaint materials) and proceed under Rule 12(b)(6) or treat Defendants' motion as one under Rule 56. The Magistrate Judge chose to proceed under Rule 56. (ECF No. 28, PageID.394.) She had discretion to do so. *Cf. Strehlke v. Grosse Pointe Pub. Sch. Sys.*, 654 F. App'x 713, 717 (6th Cir. 2016) (reviewing district court's decision to convert Rule 12(b)(6) motion to a Rule 56 motion for abuse of discretion). And her choice was certainly not an abuse of discretion.

The only wrinkle, though, is that all the discovery came from one side. In their motion, Nagy and Washington offered a sworn account about the COVID-19 measures at JCF, but in his response, Ryan did not offer his sworn account of the housing conditions at JCF.

The Magistrate Judge recognized this but reasoned that Ryan had plenty of opportunity to offer evidence in support of his cause. She noted that Ryan had "four weeks to respond to Defendants' motion for summary judgment" and that "[t]his should have provided [him] with enough time to, at the very least, file an affidavit in support of his response." (ECF No. 28, PageID.395.) "Further," said the Magistrate Judge, "even if [Ryan] could not have gathered support for his response within the four weeks, he could have requested this Court to grant him additional time to take affidavits or conduct other discovery under Rule 56(e). Plaintiff has made no such request." (ECF No. 28, PageID.395.)

All fair points, and this Court does not perceive anything erroneous about proceeding on just the evidence provided by Defendants. But for five reasons, this Court elects a different route.

*One*. Ryan clearly wants discovery. After the Magistrate Judge issued her report and recommendation, Ryan filed a "motion to defer summary judgment" because he "has not been afforded a sufficient opportunity for discovery." (ECF No. 31, PageID.414.) And in his objections to the Magistrate Judge's report and recommendation, Ryan asks this Court to address his motion to defer summary judgment before addressing his objections. (ECF No. 32, PageID.421.) Defendants have not filed a response to Ryan's request to defer summary judgment. (Nor have they filed a response to Ryan's objections.) So Ryan's request for discovery is unopposed, which provides some justification for granting it.

10

*Two.* While Ryan should have requested discovery before the Magistrate Judge issued her report, there are some possible explanations for his tardy request. For one, Defendants ambiguously filed their motion as one under Rule 12(b)(6) and, "in the alternative," under Rule 56. So it was possible that the motion would be treated as a Rule 12(b)(6) motion, which, of course, would not have required Ryan to present any evidence. Further, Defendants, at least in significant part, argued that the overall response to COVID-19 at JCF was adequate. Indeed, Ryan says that he interpreted Defendants' motion as non-responsive to his compliant, which focused on shared housing. (ECF No. 31, PageID.417.) Ryan says he believed that Defendants had thus waived a challenge to his complaint and that he did not need to submit evidence. (*Id.*) Given that Ryan is not an attorney and is proceeding without one, Ryan's interpretation of Defendants' motion was not entirely unreasonable. Moreover, while notice might not have been required, Ryan was never told that Defendants' ambiguous motion would be treated as one for summary judgment. So that too might partly explain why Ryan's request for discovery is tardy.

*Three.* Also favoring Ryan's request for discovery is that the current record evidence might be stale. The most recent affidavit of record was signed in December 2020. As anyone who has lived through this pandemic knows, a lot changes in just a few months—let alone a year. Indeed, early this past summer, with COVID-19 vaccines on the rise and case counts falling, it seemed unimaginable that as of January 2022, this country would have case counts far exceeding any other point in the pandemic and hospitalizations that match the previous high point. *Coronavirus*

11

*in the U.S.: Latest Map and Case Count*, The New York Times, https://perma.cc/5A62-BJ2N. Or take a case-specific example: in their motion, which was filed in May 2021, Defendants stated that there were only two active COVID-19 cases at JCF (ECF No. 24, PageID.166); but post-Omicron variant, data from January 12, 2022, shows that there are now 205 active COVID-19 cases at JCF, *MDOC Response and Information on Coronavirus (COVID-19)*, Mich. Dept. of Corr., https://perma.cc/S4FT-QPD6. As another example, Nagy's affidavits from 2020 state that inmates at JCF were being tested on a weekly basis, that if anyone tested positive, they would be isolated, and that even "prisoners under investigation" for COVID-19 were isolated. (ECF No. 24-2, PageID.193–194; ECF No. 24-2, PageID.210.) Whether those practices are still in place over a year later would be relevant to whether there is any infringement of Ryan's Eighth Amendment rights going forward.

*Four.* The current evidence is not directed to the housing situation at JCF. True, Nagy's May 2020 affidavit provides a bit of information about the pole barns. There, Nagy stated that there "are physical limitations in what we can do to maintain six-foot social distancing in living quarters and bunk bed areas." (ECF No. 24-2, PageID.220.) "However," Nagy averred, "JCF has established separate housing units to cohort [people who may have COVID-19]." (ECF No. 24-2, PageID.221.) As of May 2020, there were "four COVID positive units in pole barn structures" and "two COVID negative units." (*Id.*) While this provides some information that is relevant to Ryan's challenge to the multiple-person housing situation at JCF, key information is missing. How many people live and sleep in one pole barn? How large is a pole barn?

12

How is air circulated in a pole barn? How close are the beds? What percentage of people in a pole barn are vaccinated? What happens if someone in the pole barn has COVID symptoms or tests positive for the virus? There are also similar unanswered questions about the arrangement where two people share a single-person cell.

*Five.* As a final reason for permitting discovery, the Court notes that there is almost no evidence about Ryan's particular situation. True, the Court has Ryan's original complaint (with attachments) and Ryan's amended complaint, both of which provide some information about Ryan's situation. But unsworn statements are not evidence. *See George v. Whitmer*, No. 20-12579, 2021 WL 1976314, at *3 (E.D. Mich. May 18, 2021) (citing *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010)). And while Ryan's original complaint states that it is "notarized verified sworn," there is no statement that, under penalty of perjury, the allegations are true. And Ryan's amended complaint is likewise not sworn under penalty of perjury.

And even if the Court could consider the unsworn statements at summary judgment, facts about Ryan's particular circumstances are scattered in various filings and, even then, do not provide a complete picture. In a grievance, Ryan stated that he is "currently in a single cell"—but that grievance is over a year-and-a-half old. (ECF No. 1, PageID.11.) And the Court has no way to tell how often a person's housing changes from a single-person cell, to sharing a cell, to sharing a pole-barn. In his amended complaint, Ryan alleges that he has "over 20 chronic underlying condition[s] including but not limited to mixed hyperlipidemia, obstructive sleep apnea, hypertension, hyperstesis and more"—but these high-level descriptions of medical

13

conditions make it difficult to assess whether Ryan is at a high risk of severe illness should he contract COVID-19. In a motion for extension of time, Ryan tells the Court he contracted COVID-19 in November 2021 and was hospitalized. (ECF No. 29, PageID.409.) All this just underscores the Court's point: rather than have to piece together statements from a grievance, an amended complaint, and a motion, only to still not have all the relevant information (e.g., Ryan's age and vaccination status), it would be better for the parties to present a coherent and complete picture of Ryan's current health and housing status.

In all, while it would likely be appropriate to decide Defendants' motion on the record now before the Court, the Court elects a more conservative approach. As detailed in the order below, the parties are to engage in a brief discovery period and Defendants may then file a second motion for summary judgment.

IV.

That largely resolves the pending motions, but there are a couple loose ends to tie up.

In their motion, Defendants argue that Ryan has not adequately pled their personal involvement, which is necessary to pursue a claim under 42 U.S.C. § 1983. (ECF No. 24, PageID.171.) As to Nagy and Washington, this argument is a non-starter. In Nagy's affidavit, he states, "With respect to COVID-19, specifically, I am involved daily in the implementation of all MDOC policies and directives for preventing the spread of COVID-19 within JCF." (ECF No. 24-2, PageID.189.) And in Washington's affidavit, she states, "With respect to COVID-19, specifically, I am

involved daily in the identification, planning, creation, and implementation of all MDOC policies and directives for preventing the spread of COVID-19 within MDOC facilities." (ECF No. 24-5, PageID.298.) The Court is not now persuaded to dismiss Nagy and Washington for lack of personal involvement. But as to Whitmer, Defendants' argument fares better. While it may be that at some distant level, Whitmer's policies affect the COVID-19 response at JCF, on the record before the Court, her actions are too attenuated from the harms Ryan alleges. So she will be dismissed.

The Court also notes that, at this time, it makes no finding as to the viability of Ryan's claim under the Michigan Constitution. In their motion, Defendants argued that if this Court thought that the federal and state standards differed, it should not exercise supplemental jurisdiction over Ryan's state law claim. (ECF No. 24, PageID.180–181.) And in light of her recommendation to dismiss the federal claim, the Magistrate Judge recommends declining supplemental jurisdiction over the state claim. (ECF No. 28, PageID.407.) That may well end up being the proper route to take. On the other hand, neither party has argued that the U.S. Constitution's prohibition on "cruel and unusual punishments" is different from the Michigan Constitution's prohibition on "cruel or unusual punishment" on the facts of this case. *Compare* U.S. Const. amend. VIII, *with* Mich. Const. art. I, § 16. So it would be entirely fair for Ryan's claims under both federal and state law to rise and fall together. In any event, this issue can be revisited at a later date.

V.

For the reasons given, the Court ADOPTS IN PART the Magistrate Judge's report and recommendation (ECF No. 28) and GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss and, in the alternative, for summary judgment (ECF No. 24). In particular, Governor Whitmer is DISMISSED, and Ryan's claims, insofar as they seek damages, are DISMISSED. But Ryan's claims, insofar as they seek a prospective, injunctive relief, remain in this case.

Ryan's motion to defer Defendants' motion for summary judgment (ECF No. 31) is GRANTED.

The parties are to exchange limited, written discovery and provide responses by April 15, 2021; Defendants can then file another motion for summary judgment by May 15, 2021. As this opinion has indicated, the discovery should focus on facts relating to Ryan's risk of contracting a serious, contagious disease (like COVID-19) due to his housing status. Because discovery cannot be based on a moving target, the parties should focus on Ryan's circumstances as of February 1, 2022. Because this case remains referred to Magistrate Judge Morris for all pretrial matters, she is free to adjust this schedule as she sees fit.

SO ORDERED.

Dated: January 26, 2022

s/Laurie J. Michelson<br>
LAURIE J. MICHELSON<br>
UNITED STATES DISTRICT JUDGE